**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| In re Swift Transportation Co., Inc., Securities Litigation _____ This document relates to all actions. | No. CV 04-2435-PHX-NVW **ORDER** (Not for publication) |

This is a consolidated class action proceeding.  Lead Plaintiff ("Plaintiff") claims that Defendants violated § 10(b) of the Securities Exchange Act of 1934 and Section 20(a) of the Exchange Act when they made material misrepresentations that artificially inflated the price of Swift stock in order to protect Swift's Chief Executive Office from a margin call on Swift stock.

Defendants bring this motion pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 on the ground that the Complaint fails to state a claim against Defendants.

**I.     Statement of the Case**

This case began with separate actions.  On May 5, 2005, the court granted a motion to consolidate the actions, Doc. # 33, and on June 9, 2005, the court appointed a lead plaintiff

1   and counsel.  Doc. # 35.  On August 19, 2005, Plaintiff filed a Consolidated Class Action

2   Complaint ("Complaint").  Doc. # 43.[1]

3         As set forth in the Complaint, Swift is a Nevada trucking company with its

4   headquarters located in Phoenix.  Doc. # 43 at ¶ 15.  Swift is the largest stand-alone trucking

5   company in the United States.  *Id.* at ¶ 33.  Its stock is traded on the NASDAQ.  *Id.* at 24.

6   At all relevant times, Defendant Gary R Enzor ("Enzor") was Swift's Chief Financial Officer,

7   Defendant Patrick J. Farley ("Farley") was an executive vice president, Defendant Jerry C.

8   Moyes ("Moyes") was Swift's Chairman of the Board and Chief Executive Officer, and

9   Defendant William F. Riley III ("Riley") was Swift's Senior Executive Vice President,

10   Secretary, and Director.  *Id.* at ¶¶ 16-19.

11         The class period for this action comprises all purchasers of Swift securities between

12   October 16, 2003, and September 15, 2004.  *Id.* at ¶ 1.  At the beginning of the class period,

13   Swift was reporting high earnings and was optimistic about its ability to continue improving

14   its earnings over the upcoming year.  *Id.* at 2.

15         On October 3, 2003, the Federal Motor Carrier Safety Administration ("FMCSA")

16   conducted a compliance review of Swift.  *Id.* at ¶ 42. At some point after the audit, FMCSA

17   recommended downgrading Swift's safety rating to conditional because of a significant

18   number of falsified driver logs.  *Id.* at ¶ 43.  On November 24, 2003, FMCSA's website

19   displayed Swift's proposed safety rating as conditional.  Swift first publicly addressed

20   FMCSA's proposed safety rating on November 25, 2003.  *Id.* at ¶ 46.  At this time, Swift

21   stated that the safety rating downgrade was a clerical error.  *Id.*  On December 18, 2003,

22   Swift sought a stay to prevent FMCSA from permanently downgrading Swift's safety rating

23   to conditional, which FMCSA granted.  Ultimately, Swift's safety rating was never

24   downgraded to conditional, but the issue was not resolved until October 7, 2005.

25

26         [1]Presumably because of the length of the document, Plaintiff filed three documents
as the amended Complaint, Doc. # 43, Doc. # 44, and Doc. # 45.  For the purposes of this

27   order, Plaintiff's Complaint will always be referred to as Doc. # 43, even though a particular

28   paragraph may be located in one of the other two documents.

1        Beginning on January 4, 2004, new federal Hours of Service ("HoS") regulations went

2 into effect, limiting daily driving time of commercial trucks to eleven continuous hours,

3 requiring drivers to count breaks as driving times, and requiring drivers to take consecutive

4 hours of off-duty time following each fourteen-hour workday. *Id.* at ¶ 59. These new HoS

5 regulations affected Swift because Swift paid its drivers on the basis of miles driven, and the

6 new HoS regulations effectively reduced the amount of miles that Swift drivers could drive

7 each day. *Id.*

8        In 2004, fuel prices rose throughout the country, affecting companies such as Swift

9 that consumed high quantities of gasoline. *Id.* at 59. In response, Swift attempted to apply

10 a surcharge to its customers to help minimize the effect of this increased cost. At the end of

11 the class period, Swift announced an earnings shortfall that was at least partly the result of

12 escalating fuel prices throughout the summer of 2004. *Id.* at ¶ 159.

13        Between May 21, 2004 and May 24, 2004, Moyes purchased 187,000 shares of Swift

14 stock. *Id.* at 147. On May 24, 2004, Swift issued a press release in which it provided that

15 Swift would repurchase an additional $40 million worth of its common stock. *Id.* at 148.

16 Following this announcement, and because of the suspicious nature of Moyes's purchase,

17 Swift's Board of Directors placed Moyes's profit in a trust account administered by a

18 committee of Swift's independent directors. *Id.* at 150. Subsequently, the SEC investigated

19 Moyes's purchase, and the parties reached a settlement. Doc. # 56, Exhibit 17.

20        Plaintiff alleges that Defendants made numerous material misrepresentations about

21 the financial health of Swift and Swift's ability to cope with obstacles that arose during the

22 class period. Plaintiff further alleges that Defendants made these misrepresentations to

23 protect their CEO, Jerry C. Moyes ("Moyes"), from a margin call. Doc. # 43 at ¶ 5. Moyes

24 and his family owned between 34% and 40% of Swift's outstanding stock, and Moyes had

25 pledged 96% of his shares, at a value of $15 a share, to secure loans to build the new Coyote

26 professional ice hockey arena in Glendale, Arizona. *Id.* at ¶¶ 6, 35, 41.

27        Plaintiff alleges (1) that all Defendants violated Section 10(b) of the Securities

28 Exchange Act of 1934, 15 U.S.C. § 78j(b), and its implementing regulation, Rule 10b-5

1  promulgated in 17 C.F.R. § 240.10b-5(b), and (2) that Swift, Moyes, Enzor, and Riley
2  violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

3  Defendants filed a Rule 12(b)(6) motion for failure to state a claim upon which relief
4  can be granted, arguing that Plaintiff failed to properly allege (1) loss causation, (2) that any
5  Defendant made a material misrepresentation, and (3) that Defendants acted with scienter.

6  **II.   Legal Standard**

7  **A.   General Standard Governing Motions to Dismiss**

8  Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should not be
9  granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support
10  of his claims which would entitle him to relief." *Barnett v. Centoni*, 31 F.3d 813, 816 (9th
11  Cir. 1994).  When analyzing a complaint for failure to state a claim, all factual allegations
12  are taken as true and construed in the light most favorable to the nonmoving party.  *See Iolab*
13  *Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1504 (9th Cir. 1994).   All reasonable inferences
14  are to be drawn in favor of the plaintiff.  *Jacobsen v. Hughes Aircraft*, 105 F.3d 1288, 1296
15  (9th Cir. 1997).  When the complaint is dismissed for failure to state a claim, "leave to amend
16  should be granted unless the court determines that the allegation of other facts consistent with
17  the challenged pleading could not possibly cure the deficiency."  *Schreiber Distrib. Co. v.*
18  *Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).  Leave to amend is properly
19  denied "where the amendment would be futile." *DeSoto Yellow Freight Sys.*, 957 F.2d 655,
20  658 (9th Cir. 1992).

21  For the purposes of considering Defendants' Rule 12(b)(6) motion, the court will
22  consider documents submitted by Defendants and Plaintiff that were referenced by the
23  Complaint, the authenticity of which has not been questioned.  *See No. 84 Employer-*
24  *Teamster Join Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 924 n.2
25  (9th Cir. 2003).  Therefore, the court will consider Doc. # 56, Exhibits 1-9 and Doc. # 59,
26  Exhibit 1 because Plaintiff referred to those documents in its Complaint and their authenticity
27  has not been questioned.

28

1    Defendants also ask the court to take judicial notice of (1) excerpts from Swift's 10-K

2    forms that it filed with the SEC on March 29, 220, March 28, 2003, November 14, 2002, and

3    August 13, 2003; (2) an excerpt from Swift's From 8-K filed with the SEC on September 23,

4    2005; (3) the SEC Litigation Release No. 19389, September 22, 2005; (4) the SEC's

5    complaint against Moyes; (5) a Swift press release dated October 10, 2005, (6) a chart of

6    Swift's share prices from October 16, 2003 to March 11, 2005, and (7) the Department of

7    Transportation, FMCSA, Hours of Service Regulations dated October 1, 2002.  Doc. # 55.

8    Courts may take judicial notice of matters of public record outside the pleadings.

9    *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (citations omitted).  *See*

10   *also Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1353 n.3 (S.D. Cal. 1998) ("Judicial

11   notice of documents required to be filed by law is appropriate.").  Because Defendants ask

12   the court to take judicial notice of documents of public knowledge, and because Plaintiff has

13   not challenged Defendants on this issue, the Court takes judicial notice of the documents

14   listed above.

15       **B.    Pleading Requirements in Securities Fraud Actions**

16   To state a claim for securities fraud under Section 10(b) of the 1934 Act and Rule

17   10b-5, a complaint must hurdle three pleading barriers.  First, it must comport with Rule 8(a)

18   of the Federal Rules of Civil Procedure, which requires that complaints provide a short and

19   plain statement of the claim.

20   Second, it must conform with the "particularity" obligations imposed by Rule 9(b) of

21   the Federal Rules of Civil Procedure.  *In re GlenFed, Inc. Sec. Litig.*, 42 F. 3d 1541, 1545

22   (9th Cir. 1994).  Rule 9(b) provides that "in all averments of fraud or mistake, the

23   circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent,

24   knowledge, and other condition of mind may be averred generally."  Fed. R. Civ. P. 9(b).

25   Third, it must meet the pleading requirements provided in the Private Securities

26   Litigation Reform Act ("PSLRA").  The PSLRA amplifies the "particularity" obligations of

27   Rule 9(b) by requiring that the complaint specify "each statement alleged to have been

28   misleading" and by requiring that the complaint specify the reason or reasons why the

1    statement was false or misleading.  15 U.S.C. § 78u-4(b)(1).  "[I]f an allegation regarding the

2    statement or omission is made on information and belief, the complaint shall state with

3    particularity all facts on which that belief is formed."  *Id.*  Moreover, the PSLRA provides

4    that the complaint must "state with particularity facts giving rise to a strong inference that

5    the defendant acted with the required state of mind," or scienter.  *Id.* at (b)(2).  The required

6    state of mind is one of "deliberate recklessness."  *In re Silicon Graphics Sec. Litig.*, 183 F.3d

7    970, 975 (9th Cir. 1999).  "Recklessness only satisfies scienter under § 10(b) to the extent that

8    it reflects some degree of intentional conscious misconduct."  *Id.* at 977.

9    　　　Therefore, plaintiffs must "plead, at a minimum, particular facts giving rise to a strong

10   inference of deliberate or conscious recklessness."  *Id.* at 979.  A reasonable inference is not

11   enough.  *Id.* at 974.  A complaint merely alleging that a defendant had the motive and

12   opportunity to commit fraud is insufficient.  *Id.*  In assessing whether a plaintiff has

13   sufficiently pled scienter, the totality of the allegations is considered.  *Nursing Home Pension*

14   *Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).  Additionally, all

15   reasonable inferences must be considered, not just those favorable to the plaintiff.  *Id.*

16   **III.   Analysis**

17   　　　The basic elements of an action involving publicly-traded securities and purchases or

18   sales in public securities markets are: (1) a material misrepresentation; (2) scienter; (3) a

19   connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6)

20   loss causation, which is a causal connection between the material misrepresentation and the

21   loss.  *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005).

22   　　　Defendants argue that Plaintiff has failed adequately to allege loss causation, a

23   material misrepresentation, and that Defendants acted with scienter.

24   　　　**A.   Loss Causation**

25   　　　The requirement of loss causation is codified in the PSLRA, which provides that "in

26   any private action arising under this chapter, the plaintiff shall have the burden of proving

27   that the act or omission of the defendant alleged to violate this chapter caused the loss for

28   which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).

1    The Supreme Court has recently rejected the theory that artificial inflation of a

2    security's purchase price, without more, is sufficient to establish loss causation. *Dura*

3    *Pharm.*, 125 S. Ct. at 1634 (stating that "the 'artificially inflated purchase price' is not itself

4    a relevant economic loss"). Allowing such a theory to establish loss causation "would allow

5    recovery where a misrepresentation leads to an inflated purchase price but nonetheless does

6    not proximately cause any economic loss." *Id.* at 1633. Moreover, "to establish loss

7    causation, a plaintiff must allege that the subject of the fraudulent statement or omission was

8    the cause of the actual loss suffered, i.e., that the misstatement or omission concealed

9    something from the market that, when disclosed, negatively affected the value of the

10   security." *Lentell v. Merill Lynch & Co.*, 396 F.3d 161, 173 (2nd Cir. 2005) (alterations

11   omitted) (citations and internal quotation marks omitted). *See also Bennett v. H&R Block*

12   *Fin. Advisors, Inc.*, 2005 U.S. Dist. LEXIS 25273, *7-8 (N.D. Cal. 2005) (applying *Dura* and

13   *Lentell* in concluding that plaintiffs had not pleaded loss causation).

14   As was the case in *Dura*, Plaintiff's Complaint only discusses loss causation in one

15   paragraph. *See* Doc. #43 at ¶ 189 ("Lead Plaintiff and the other members of the Class

16   acquired Swift securities during the Class Period at artificially high prices and were damaged

17   thereby."). While Plaintiff has alleged numerous misrepresentations, *see* ¶¶ 88-157, Plaintiff

18   does not explain how these misrepresentations caused Plaintiff to suffer an economic loss.

19   It is without question that Swift's stock price was turbulent during 2003 and 2004–the stock

20   price ranged from a high of $23.93 on October 16, 2003 to a low of $14.83 on May 7, 2004,

21   and again broke the $20 barrier by November 2004–but Plaintiff only alleges that the

22   material misrepresentations induced Plaintiff to buy stock at artificially high prices.

23   Plaintiff argues that *In re Immune Response Secs. Litig.*, 375 F. Supp.2d 983 (S.D.

24   Cal. 2005), demonstrates that Plaintiff adequately alleged loss causation. *In re Immune*

25   *Response* involved a securities class action in which the plaintiffs alleged that the defendants

26   had misrepresented the likelihood of receiving FDA approval for a drug and the likelihood

27   of continued funding from a large donor. *Id.* at 1025. The court found that the plaintiffs

28   adequately alleged loss causation because they alleged that the wrongdoing caused the stock

1    prices artificially to inflate and that the prices dropped sharply when the truth became

2    publicly known.  *Id.* ("[T]he conjunction of these two allegations makes clear that Plaintiffs

3    claim the disclosures caused the drop in stock price.").  In this case, Plaintiff's Complaint

4    provides the reader with the price of Swift's stock throughout the class period, but Plaintiff

5    never alleges that any stock-price drops were in response to Swift's revelation of information

6    that it had previously misrepresented.

7          The other cases cited by Plaintiff are equally unpersuasive.  *See Montalvo v. Tripos*,

8    *Inc.*, No. 03-995, 2005 U.S. Dist. LEXIS 22752, *27 (E.D. Mo. Sept. 30, 2005) (complaint

9    alleged that stock prices dropped in response to fraud committed when defendants falsely

10   projected their future earnings in financial statements).  Unlike the case here, in *Motalvo*, the

11   plaintiffs alleged that specific misrepresentations caused them to suffer an economic loss.

12   Plaintiff cites *In re Parmalat Sec. Litig.*, 375 F. Supp.2d 278, (S.D.N.Y. 2005), for the

13   proposition that a plaintiff can adequately allege loss causation when the revelation of the

14   fraud occurs after the end of the class period.  It is unclear why Plaintiff believes this case

15   is relevant.

16         Given the similarity between the complaint discussed in *Dura* and Plaintiff's

17   Complaint, it is clear that Plaintiff has failed to allege loss causation.  Despite providing

18   numerous alleged material misrepresentations, Plaintiff fails to explain how any of those

19   misrepresentations caused Plaintiff to suffer an economic loss.  In addition, the cases Plaintiff

20   has cited are factually inapposite and unpersuasive.

21         **B.    Material Misrepresentation**

22         While determining that Plaintiff has not sufficiently alleged loss causation requires

23   the dismissal of Plaintiff's Complaint, the parties have already briefed whether Plaintiff

24   adequately alleges a material misrepresentation.  Therefore, the court addresses this issue.

25         As discussed above, to comport with the heightened pleading requirements of the

26   PSLRA, to allege a misrepresentation, "the complaint shall specify each statement alleged

27   to have been misleading, the reason or reasons why the statement is misleading, and, if an

28   allegation regarding the statement or omission is made on information and belief, the

complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).   Furthermore, "Rule 9(b) requires particularized allegations of the circumstances *constituting* fraud.    The time, place, and content of an alleged misrepresentation may identify the statement or the omission complained of, but these circumstances do not constitute fraud." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-48 (9th Cir. 1994) (emphasis in original) (citations and internal quotation marks omitted). "[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).

In its Complaint, Plaintiff alleges that Defendants made numerous material misrepresentations.  However, the manner in which Plaintiff presents its allegations makes it difficult to discern the reasons why each particular statement is materially misleading.  For example, after alleging that Moyes made material misrepresentations to an analyst, Plaintiff simply provides a list of different reasons why the statement was allegedly false. *See* Doc. # 43 at ¶¶ 112-13.  Plaintiff makes no effort to specify which reason applies to which portion of the challenged statement.  The court and Defendants are left to take that necessary step. It appears that Plaintiff submitted twenty-three pages of alleged material misrepresentations, many in the form of lengthy block quotes, hoping the court would find a particular statement materially misleading.   Nonetheless, rather than dismissing the Complaint for failure to comply with Rule 8 of the Federal Rules of Civil Procedure, the court has attempted to determine whether Plaintiff has adequately alleged a material misrepresentation.

Plaintiff alleges that Defendants made material misrepresentations concerning five topics: (1) Swift's safety rating, (2) the impact of the revised HOS Regulations, (3) Swift's ability to impose a fuel surcharge, (4) Swift's decision to repurchase its shares, and (5) Swift's financial condition.

### 1.    Swift's Safety Rating

On October 3, 2003, the Federal Motor Carrier Safety Administration ("FMCSA") conducted a compliance review of Swift.  As discussed above, as a result of this review, FMCSA proposed changing Swift's safety rating from satisfactory to conditional.  Doc. # 43

at ¶¶42-3. Swift successfully petitioned the FMCSA to stay the rating change until a further review could be conducted. *Id.* On September 16, 2005, FMCSA completed another safety review of Swift and concluded that it would not downgrade Swift's rating. Doc # 59, Exhibit 1. FMCSA then determined that the petition for administrative review of the earlier conditional rating was moot. *Id.* Swift's safety rating was never downgraded from satisfactory to conditional.

Plaintiff alleges that Defendants made numerous false statements about the FMCSA audit. While Plaintiff has attempted in its Opposition to Defendants' motion to proffer additional explanations why Defendants made these alleged misrepresentations, these additional arguments are not properly before the court because a motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint alone. Therefore, Plaintiff's additional arguments will not be considered.

### a.      November 26, 2003 Conference Call

The first alleged material misrepresentation is a statement made by Moyes to an analyst regarding FMCSA's safety rating. *See* Doc. # 43 at ¶ 103. However, Plaintiff failed to allege any facts establishing why this statement was false or why it was material.

### b.      Press Release

Plaintiff alleges that Defendants made a material misrepresentation when they issued a press release stating that the only point of dispute with the FMCSA was the accuracy of the driver logs. *Id.* at ¶ 106. Plaintiff alleges that this statement was false because (1) the company actually used untrained and unqualified drivers and had a higher-than-reported accident rate and (2) the safety rating was not a clerical error but was actually a deliberate rating based on falsified driver logs. *Id.* at ¶ 107.

The first explanation for why Moyes's statement was false is irrelevant. The sole issue is whether Moyes misrepresented the extent of, or the reasons behind, the FMCSA audit. The fact that Swift may have engaged in other unsafe practices is of no significance in determining whether the specific statement at issue–the press release–was false. Similarly, the second explanation also falls short. Nowhere in the press release did Moyes suggest that the FMCSA decision was a typographical error.

Therefore, Plaintiff has not sufficiently alleged that this statement was a misrepresentation.

### c.     January 28, 2004

Plaintiff alleges that Moyes made material misrepresentations on January 28, 2004, when he discussed the FMCSA audit, stated that Swift expected to succeed in maintaining its satisfactory safety rating, and stated that he believed a safety downgrade would not result in a loss of customers.  *Id.* at ¶ 112.  Plaintiff alleges that this statement was materially misleading because Swift was in danger of losing its satisfactory safety rating as a result of an increased number of accidents and because FMCSA's decision to downgrade Swift's safety rating was not a "clerical" error.

Plaintiff's proffered explanations fail to show that this statement contained any material misrepresentations.  Moyes's statement described the company's "expect[ations]" and "belie[fs]" concerning the FMCSA audit.  Plaintiff has made no effort to show that Moyes–or Swift–actually harbored different expectations or beliefs.  Moreover, Plaintiff has not alleged any facts establishing that FMCSA's proposed safety downgrade was based on any reason other than falsified driver logs.

### d.     Form 10-K

Plaintiff alleges that Defendants made material misrepresentations concerning the FMCSA audit review in Swift's Form 10-K.  *Id.* at ¶ 126.  Plaintiff alleges that these statements were materially misleading because of the same two reasons proffered above: (1) untrained drivers caused an increase in Swift's accident rate, and (2) the FMCSA decision was not an error.  Neither reason is relevant here.  In its Form 10-K, Swift merely provided a time-line of the audit and its aftermath.  Plaintiff does not dispute that any of these events occurred or allege that Defendants had a duty to disclose additional information

### e.     March 19, 2004 Conference Call

Plaintiff alleges that Moyes materially misrepresented the effect of FMCSA's proposed safety downgrade when he spoke with an analyst on March 19, 2004.  *Id.* at ¶ 134.  Moyes stated that there was an approximately 10% chance that Swift's safety rating would be downgraded to conditional and that, even if such a downgrade occurred, it would not have

any effect on Swift's finances. *Id.* Plaintiff alleges that this statement was materially false because Swift was in severe danger of losing its satisfactory safety rating because it had under-reported accidents and falsified driver logs. *Id.* at ¶ 135.

As discussed above, merely alleging that Swift was in danger of losing its satisfactory safety rating is insufficient under the PSLRA. Plaintiff must allege particularized facts establishing that this was a material misrepresentation at the time the statement was made. Instead, Plaintiff has again offered the same generalized references to untrained drivers and clerical errors without making any real attempt to explain with particularity why the specific statement at issue was false.

### f. Leave to Amend

Because it is unclear whether Plaintiff can adequately allege that Defendants made material misrepresentations about the FMCSA's proposal to downgrade Swift's safety rating, Plaintiff is granted leave to amend its Complaint regarding this issue.

### 2. Impact of the Revised Hours of Service Regulations

In April 2003, the FMCSA promulgated HoS regulations to take effect on January 4, 2004. Doc. # 43 at ¶ 59. These new regulations limited daily driving time, required drivers to count breaks as driving time, and required drivers to take ten consecutive hours of off-duty time after each fourteen-hour workday. *Id.* The HoS regulations required Swift to make adjustments, as Swift compensated its drivers on the basis of how many miles they drove. *Id.*

Plaintiff alleges that Defendants materially misrepresented the effect that the new HoS regulations would have on Swift's finances.

### a. Swift's November 14, 2003 Form 10-Q

On November 14, 2003, Swift filed its Form 10-Q form, which Plaintiff alleges included material misrepresentations. The 10-Q form provided:

> To the extent the new regulations reduce time available to drive as a result of the changes to the calculation of the on-duty period, our drivers' and owner-operators' pay will be reduced. We expect to work with our shippers to minimize the loss of driver and owner-operator productivity. In situations where productivity losses occur, we expect to be compensated by the shippers and compensate our drivers and owner-operators accordingly so as to maintain our existing pay structure. If we are not

successful in working with our shippers to adjust for the impact these new regulations will have on our driver and owner-operator productivity, it could have a negative impact on our financial results.

Doc. # 43 at ¶ 92.  Plaintiff alleges that this statement was materially misleading because Defendants failed to disclose that "[d]espite a severe, industry-wide shortage of qualified drivers, the Company was underpaying its drivers, relative to its competitors, and was, therefore, unable to recruit and retain sufficient drivers for its fleet.  This put the Company at a competitive disadvantage which only worsened when it refused to consider raising driver pay to compensate drivers for the fact that they would be able to log less total drive time under the HoS regulations."  *Id.* at  ¶ 96(a).

Plaintiff's explanation is unavailing.  Critically, Plaintiff has not alleged that any of the information or statements contained in the 10-Q Form were false.  Instead, Plaintiff seems to be alleging that Defendants made a misrepresentation because they failed to "consider raising driver pay."  That a defendant's business strategy may be open to criticism does not show that the defendant made a misrepresentation.  Therefore, Plaintiff has not adequately alleged that Defendants made any misrepresentations concerning the HOS regulations in the Form 10-Q.

### b.    November 26, 2003 Statements

Plaintiff alleges that Moyes and Riley, when speaking with analysts before the HoS regulations went into effect, materially misrepresented the effect of the new HoS regulations. Moyes again predicted that the new regulations would not affect Swift's productivity and that any increase in costs because of the regulations would be passed on to customers.  *Id.* at ¶ 100.  Riley suggested that Swift's large size would result in drivers of smaller carriers switching to Swift, further strengthening Swift's finances.  *Id.* at ¶ 101.

Plaintiff alleges that these statements were misleading because "Swift did not have the power to aggressively maximize fee income from its contracts with its customers, and it was not able to adequately recompense its drivers for the increased cost of HoS regulations out of such fee income."  *Id.* at ¶ 102.

While Plaintiff claims that Swift would be unable to transfer the increased costs to its customers, Plaintiff has not alleged any facts–such as examples of customers who refused

to pay the fee–supporting this allegation.   Such conclusory statements fail to allege adequately a material misrepresentation.  *See Lain v. Evans*, 123 F. Supp. 2d 344, 348 (D. Tex. 2000) ("The Complaint fails to explain how these statements were false and misleading to potential investors, instead proposing in a conclusory manner that the statements were 'false and misleading when made.'").

### c.   January 28, 2004 Conference Call

Plaintiff alleges that Moyes and Enzor materially misrepresented Swift's financial future during a January 28, 2004 conference call.  Plaintiff alleges that Moyes made a material misrepresentation when he stated: "'Our customers have been very receptive to providing rate compensation to offset any additional pay that we're having to give our drivers . . . [.] So I think what we said on our conference call pertaining to hours of service is right on track.'"  *Id.* at ¶ 109.  Enzor promised analysts that Swift would keep seeking rate increases from its customers, which it had been successful in receiving to date.  *Id.* at ¶ 110.

Plaintiff alleges that these statements were material misrepresentations because the "Company had not been successful with imposing the additional fees sufficient to compensate it for the loss caused by the HoS regulations or to allow it to compensate its drivers for pay lost as a result of the driving limitations imposed by the HoS regulations, for the reasons set forth in ¶¶ 59-60."

Plaintiff's allegation suffers from several shortcomings.  First, it is unclear to which "conference call" Moyes is referring, making it difficult to know the breadth of Moyes's statement.  Second, Moyes and Enzor were discussing Swift's ability to increase rates to pay drivers higher wages while Plaintiff is alleging that additional accessorial fees–loading and drop-off charges–were insufficient to compensate Swift for increased costs as a result of the HoS regulations.  It is therefore questionable whether Plaintiff's explanation for why Moyes and Enzor made a material misrepresentation even applies to what each actually stated.  Third, Plaintiff has not alleged any facts suggesting that customers had not been receptive

to providing increased rate compensation or that Swift had been unable to render the HoS regulations cost-neutral in January.[2]

Plaintiff claims that a statement made by Enzor supports its argument that Defendants were unable to render the HoS regulations cost-neutral. In July 2004, Enzor stated that the Company did have to raise pay for its drivers in response to the HoS regulations. *Id.* at 60. It is unclear how Enzor's statement establishes the falsity of Moyes's statement because Moyes stated that Swift was successful in offsetting increased driver pay by receiving higher rates from its customers. Moyes did not state that Swift had not increased driver pay, which is what Enzor's statement addressed.

Plaintiff has therefore failed to allege adequately the falsity of Moyes's or Enzor's statements.

### d.    April 22, 2004 Press Conference

On April 21, 2004, Swift announced its results for the end of the first quarter of 2004, reporting its net income as $6.4 million, or eight cents a share, down from the previous year's first quarter financial results of $8.9 million, or 10 cents a share. *Id.* at ¶ 139. On April 22, 2004, Moyes held a conference call with analysts during which, according to Plaintiff's Complaint, he "stated that" what we've said on HoS is pretty well in line with what's going on,' that unmanned trucks had cost the Company 'about 5 cents in earnings damage' and that Swift had decided on a driver pay increase after all. Moyes still insisted that '[w]e're very positive that our pricing is up 5.7% - or 5.8% . . . .'" *Id.*

Plaintiff alleges that Moyes materially misrepresented the effect of the HoS regulations because "the Company had not been successful in imposing the additional fees that would compensate it for the loss caused by the HoS regulations and because the Company's earnings for the first quarter were inflated due to the reasons set forth in ¶¶ 72-85 [referring to the portion of Plaintiff's Complaint that was dedicated to Swift's alleged accounting violations]." This criticism is puzzling. Moyes admitted during the conference

---

[2]In fact, Plaintiff's Complaint alleges that on February 12, 2004, Moyes reiterated that Swift had effectively made the HoS regulations cost-neutral for January 2004. *See Id.* at ¶ 118.

call that the HoS regulations had resulted in unmanned trucks and required Swift to raise driver pay despite its earlier belief that an increase would be unnecessary. These are precisely the facts that Plaintiff claims were omitted.

### e.    Leave to Amend

Because it is unclear whether Plaintiff can adequately allege that Defendants materially misrepresented the effect of the HoS regulations, Plaintiff is granted leave to amend its Complaint regarding this issue.

### 3.    Fuel Surcharge

In 2004, the price of fuel went up, negatively affecting companies such as Swift that operate trucks that run on gasoline. Plaintiff alleges that Moyes and Enzor made false statements about Swift's ability to collect a fuel surcharge from its customers in response to rising fuel costs.

Plaintiff alleges that on April 20, 2004, Moyes made a material misrepresentation when he stated that Swift was being very aggressive in imposing a west coast fuel surcharge. *Id.* at ¶ 139. Yet Plaintiff does not allege any facts in its Complaint establishing that Moyes's statement was a material misrepresentation. Therefore, Plaintiff has not adequately alleged facts establishing that this statement was a material misrepresentation.

Plaintiff also alleges that Enzor and Moyes materially misrepresented the fuel surcharge problem during an April 21, 2004 conference call, when both defendants stated that the fuel increase had not had a significant impact on Swift's finances. *Id.* at ¶ 143 (Enzor stating that "this year we were very active in going out and getting the West Coast Fuel surcharge" and Moyes estimating that Swift had recovered approximately 75% of the increased fuel costs). Plaintiff alleges that these statements were materially false because "Swift was not successful in imposing sufficient fuel surcharges in contracts that had been signed earlier in the year, to which Swift was locked in for the remainder of the year, and there was no lag effect that would permit Swift to ignore the express terms of its contracts and impose sufficient surcharges on all of its contracts." *Id.* at ¶ 144.

Plaintiff's allegations again fall short of establishing a material misstatement. First, it is not clear from Moyes's statement that Swift was attempting to negotiate its already-in-

place customer contracts.   Rather, it appears that Moyes stated that Swift would attempt to recover a fuel surcharge outside of its existing contracts.   Second, Swift's 10-Q forms belie Plaintiff's allegation.   Moyes made his statement on April 22, 2004, immediately following Swift's first-quarter financial results.   Between the 2003 fourth-quarter report and the first quarter of 2004, Swift's fuel costs went up by approximately $5.9 million.   Doc. # 56, Exhibit 6.   During that same period, Swift's revenues from its fuel surcharge increased by approximately $4.9 million, meaning that Swift recovered approximately 83% of the increased fuel cost with its fuel surcharge.   *Id.*   Therefore, Swift had performed exactly as Moyes stated, undermining any allegation that Moyes made a material misrepresentation when he stated that the company would seek fuel surcharges and that the company had thus far recovered about seventy-five percent of its increased fuel costs.

Because it is unclear whether Plaintiff can adequately allege that Swift misrepresented its ability to offset any fuel price increases with a fuel surcharge, Plaintiff is granted leave to amend its Complaint with regard to this issue.

### 4.   Swift's Share Repurchases

On February 11, 2004, March 23, 2004, and May 24, 2004, Swift announced that it would repurchase its shares because Swift's board of directors believed this was a smart investment in light of prevailing market prices.   Doc. # 43 at ¶ 115, 138, 148.   Plaintiff alleges that these were material misrepresentations because the real reason behind the decision to repurchase Swift stock was to prevent a margin call on the stock that Moyes had pledged to fund construction of the Coyotes' stadium.

Plaintiff has not alleged any facts supporting this conclusory allegation.   They have not alleged that any of the board of directors ever admitted to such a motive.   Furthermore, "[i]n a case involving multiple defendants, Rule 9(b) mandates that the complaint inform each defendant of his alleged role in the deception."   *Kolbeck v. LIT America, Inc.*, 923 F. Supp. 557, 569 (S.D.N.Y. 1996).   Instead, Plaintiff only alleges that all of the Board of Directors, which includes some of the Defendants, acted in concert to defraud the company in order to protect Moyes, its CEO.   Plaintiff fails to allege the facts necessary to comport with the PSLRA's heightened pleading requirements. *See id.* ("Broad allegations that several

defendants participated in a scheme, or conclusory assertions that one defendant controlled another, or that some defendants are guilty because of their association with others, do not inform each defendant of its role in the fraud and do not satisfy Rule 9(b).").

It is unclear whether Plaintiff can adequately allege that Swift materially misrepresented the reasons behind Swift's decision to repurchase its shares, and therefore Plaintiff is granted leave to amend its Complaint regarding this issue.

### 5.    Swift's Financial Reports

#### a.    Insurance and Claims Expense

Plaintiff alleges that Defendants did not prepare their financial reports in accordance with GAAP because they inaccurately reported their insurance and claims expenses. *See* Doc. # 43 at ¶¶ 63, 67, 72-78.  When a plaintiff alleges a GAAP violation, "a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation."  *In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir. 2005).  Plaintiff must allege particularized facts establishing how the company engaged in an accounting violation.

To support Plaintiff's allegation that Defendants falsely reported their insurance claims and expenses, Plaintiff points to the fact that, historically, Swift's reported insurance and claims expenses amounted to 4-5% of its operating budget.  Plaintiff alleges that during the class period, Swift reported insurance and claims expenses closer to 3%, and that this reduction demonstrates that Swift made an accounting mistake.  Doc. # 43 at ¶ 76.

There are two problems with Plaintiff's allegation.  First, during the class period, Swift reported insurance and claims expenses of 4.6% (Q303), 2.9% (Q403), 4.1% (Q104), and 3.1% (Q204) of its total operating budget.  The average was 3.675% over the entire class period.  Therefore, Plaintiff's allegation that the average of the period was "closer to 3%" is factually incorrect.  Second, while Plaintiff's Complaint refers to GAAP, Plaintiff has made no showing that GAAP requires companies to calculate insurance claims and expenses based on historical figures rather than actual figures.

Therefore, Plaintiff has failed adequately to allege that Swift materially misrepresented its financial report by undervaluing its insurance and claims expenses.

### b.    Depreciation of Swift's Tractors

In 2003, Swift decided to increase, from three to five years, the length of time for which it would keep individual tractors in use, and thus began depreciating its tractors at a slower rate. Plaintiff alleges that this decision resulted in improper depreciation and inflated financial results. *See* Doc. # 43 at ¶¶ 67, 96(b), 130.

While Plaintiff attempts to couch the issue as an issue of materiality, see Doc. # 58 at 16, this assumes that there was an accounting error. However, Plaintiff fails adequately to allege an accounting error under the PLSRA's heightened pleading requirements.

Plaintiff also fails to allege any facts establishing why this business decision was improper. For example, Plaintiff has not identified any GAAP principle establishing that a company cannot change the life of an asset after it acquires or uses that asset. Without more particular facts, Plaintiff has failed to allege that Defendants violated GAAP when they decided to extend the life of their tractors and depreciate them accordingly.

### c.    Leave to Amend

Plaintiff's Complaint falls far short of adequately alleging that Swift made material misrepresentations in its financial reports. Plaintiff has not alleged with specificity how Swift violated any established accounting principles. Moreover, Swift has never restated any of its financial reports or otherwise suggested that it violated any accounting principles. And most importantly, as discussed above, Plaintiff has only alleged that these accounting violations caused Swift's stock to be financially inflated. Plaintiff has not alleged any facts suggesting that, even if granted leave to amend this issue, it will be able to establish "loss causation" with respect to the alleged accounting violations.[3]

Given these clear shortcomings in Plaintiff's Complaint, it would be futile to allow Plaintiff the opportunity to amend this portion of its Complaint. Plaintiff's claims that

---

[3]In addition, at oral argument, Plaintiff's counsel agreed that it probably could not adequately allege loss causation.

Defendants made accounting violations that resulted in material misrepresentations are therefore dismissed with prejudice.

### C.   Scienter

Where a plaintiff has failed to allege adequately falsity, it is unnecessary to determine whether they have alleged scienter with sufficient particularity.  *See Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1252 (D. Utah 1999) ("Where plaintiffs fail to plead falsity, a fortiori they have not established that defendants knew those statements were false.").  Therefore, the court at this time does not consider Defendants' argument that Plaintiff has not adequately alleged scienter.

## IV.   Section 20(a) Claim

To prevail on a Section 20(a) claim, "plaintiffs must first allege a violation of § 10(b) or Rule 10b-5." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 (9th Cir. 2002).  Because Plaintiff failed to do so, the Section 20(a) claim is also dismissed without prejudice.

## V.   Conclusion

Plaintiff has failed to allege facts establishing that any of the misrepresentations or omissions caused Plaintiff to suffer an economic loss.  Plaintiff has also failed to allege particularized facts establishing that Defendants made any material misrepresentations or omissions.  Plaintiff may submit a further amended complaint as to all of its alleged misrepresentations except for its allegation that Defendants made material misrepresentations in their financial reports because they violated generally accepted accounting principles.  Plaintiff's claims that Defendants improperly calculated its insurance claims and expenses and improperly depreciated the lives of its tractors, which allegedly resulted in material misrepresentations in Swift's financial reports, are dismissed with prejudice.

Should Plaintiffs choose to file a further amended complaint, they need to allege facts establishing the falsity of each alleged misrepresentation or omission.  Conclusory allegations are insufficient under the PSLRA.

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss, Doc. # 54, is granted.

1
2

IT IS FURTHER ORDERED that Defendants' Request for Judicial Notice, Doc. # 55, is granted.

3
4
5
6

IT IS FURTHER ORDERED that Plaintiff's Amended Complaint, Doc. # 43, is dismissed for failure to comply with the PLSRA's pleading requirements with leave to file a further amended complaint by April 28, 2006, submitting both clean and red-lined versions in compliance with Local Rule LRCiv 15.1.

7
8
9
10
11

IT IS FURTHER ORDERED that any motion to dismiss a further amended complaint must be filed within 28 days of service of the further amended complaint, any response within 28 days of service of the motion, and any reply within 15 days of service of the response.  Oral argument on any motion to dismiss will be set for July 28, 2006, at 1:30 p.m. This briefing schedule will not be extended absent extraordinary circumstances.

12

DATED this 29th day of March 2006.

13
14
15
16

_____
Neil V. Wake
United States District Judge

17
18
19
20
21
22
23
24
25
26
27
28